1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   ELEANOR GAIL SWAIN WESTERN,       )   Case No.: 1:19-cv-0077- JLT
                                        )
12                  Plaintiff,          )   ORDER REMANDING THE ACTION PURSUANT
                                        )   TO SENTENCE FOUR OF 42 U.S.C. § 405(g)
13          v.                          )
                                        )   ORDER DIRECTING ENTRY OF JUDGMENT IN
14   COMMISSIONER OF SOCIAL SECURITY,   )   FAVOR OF PLAINTIFF ELEANOR GAIL SWAIN
                                        )   WESTERN, AND AGAINST DEFENDANT, THE
15                  Defendant.          )   COMMISSIONER OF SOCIAL SECURITY
                                        )
16   _____ )

17          Eleanor Gail Swain Western asserts she is entitled to a period of disability and disability

18   insurance benefits under Title II of the Social Security Act.  Plaintiff seeks judicial review of the

19   decision to deny her application for benefits.  Because the ALJ erred in evaluating the medical record,

20   the matter is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

21                              **<u>BACKGROUND</u>**

22          In June 2015, Plaintiff filed her application for benefits under Title II, asserting she was unable

23   to work due to the following conditions: depression, anxiety, blood pressure, thyroid problems, sleep

24   disorder, issues with her back/shoulder, and "ostiopinuainspin."  (Doc. 10-6 at 2-3; Doc. 10-7 at 6)

25   The Social Security Administration denied the application at the initial level and upon reconsideration.

26   (*See generally* Doc. 10-4)  Plaintiff requested a hearing and testified before an ALJ on September 19,

27   2017.  (*See* Doc. 10-3 at 17, 53)  The ALJ determined Plaintiff was not disabled under the Social

28   Security Act, and issued an order denying benefits on February 12, 2018.  (Doc. 10-3 at 17-33)

Plaintiff filed a request for review of the decision with the Appeals Council, which denied the request on November 27, 2018.  (Doc. 10-5 at 70; Doc. 10-3 at 2-5)  Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that a claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The process requires the ALJ to determine whether Plaintiff (1) is engaged substantial gainful activity, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

### A.    Medical Background

In October 2013, Plaintiff visited Dr. Diego Allende, reporting depression and anxiety following the recent death of her mother. (Doc. 10-8 at 64) Dr. Allende also noted Plaintiff had been diagnosed with hypothyroidism and chronic low back pain. (*Id.*) He observed that Plaintiff appeared "emotionally labile" and noted he was considering a diagnosis of Anxiety Disorder. (*Id.*) Dr. Allende prescribed Valium and Prozac for this condition and refilled a prescription for Norco for Plaintiff's back pain. (*Id.*) The following month, Dr. Allende diagnosed Plaintiff with Depression with Generalized Anxiety Disorder. (*Id.* at 63) He noted Plaintiff was "unable to work at this time." (*Id.*)

In January 2014, Plaintiff "injured her shoulder carrying a heavy case of water." (Doc. 10-8 at 18, 27) Plaintiff was employed at a grocery store and was "required to do stocking on occasion which irritate[d] her shoulder." (*Id.*) On January 20, she told Dr. Allende that she "left work due to stress." (*Id.* at 61) Plaintiff described feeling "overly emotional" without explanation and having "extreme trembles." (*Id.*) Dr. Allende opined Plaintiff was having an anxiety episode. (*Id.*)

In February 2014, Plaintiff told Dr. Allende that "things at home [were] better" and she decided not to go to a therapist. (Doc. 10-8 at 60) She continued to report pain in her right shoulder and lower back. (*Id.* at 59, 60)

In March 2014, Plaintiff underwent an MRI on her right shoulder. (Doc. 10-8 at 28) Dr. Elliot Wagner determined Plaintiff had tendinosis, "[m]ild changes of osteoarthritis in the gleno-humeral

3

joint," and mild lateral down-sloping of the acromion.  (*Id.* at 29)  In addition, the MRI showed minimal synovial effusion, fluid in the subacromial-subdeltoid and subcoracoid bursae, and thickening of the inferior glenohumeral ligament."  (*Id.*)

On May 22, 2014, Plaintiff underwent a surgical evaluation for her right shoulder pain with Dr. Peter Simonian and Jonathan Crosby, PA-C.  (Doc. 10-8 at 18-19)  Upon examination, Plaintiff exhibited tenderness, 4/5 strength in the rotator cuff, and had a "markedly positive" impingement test. (*Id.* at 18)  Due to the failed conservative care, which included two cortisone injections, Plaintiff chose to proceed with surgery on her right shoulder.  (*Id.*)

On May 29, 2014, Dr. Simonian performed an arthroscopic surgery, which included distal clavicle excision, debridement of the anterosuperior labral tears of the glenohumeral joint, and subacromial compression.  (Doc. 10-8 at 23)  Dr. Simonian noted Plaintiff's post-operative diagnoses included "[r]ight shoulder symptomatic… acromioclavicular[] arthritis [and] impingement with anterior superior labral tear of the glenohumeral joint."  (*Id.*)

Plaintiff had follow-up appointment the following week with Jared Adams, PA-C, who assisted with the surgery.  (Doc. 10-8 at 16, 23)  Plaintiff reported she was "doing fairly well" and her pain was "under control." (*Id.* at 16)  Mr. Adams noted Plaintiff was scheduled for physical therapy "two times a week for the next six weeks," pursuant to the "arthroscopic acromioplasty rehab protocol."  (*Id.*)  Mr. Adams also indicated Plaintiff would "remain temporarily totally disabled for the next six weeks," and she was directed to return "in five weeks to check her progress."  (*Id.*)

On June 13, 2014, Plaintiff began physical therapy with Daniel Alfaro.  (Doc. 10-8 at 27) Plaintiff reported her pain was 4/10, but indicated it was "up to 10/10 with increased activity."  (*Id.*) She stated she had difficulty with activities of daily living, "such as donning and doffing overhead clothing and washing her hair."  (*Id.*)  Mr. Alfaro noted Plaintiff was unable to reach and exhibited decreased range of motion in her shoulder and postural strength.  (*Id.*)  He indicated the deficits were anticipated following surgery, and recommended she proceed with the same physical therapy plan indicated by Mr. Adams.  (*Id.* at 16, 27)

In July 2014, Plaintiff visited Dr. Allende because she was out of Norco.  (Doc. 10-8 at 55) She told Dr. Allende that she was "doing water activity" in her pool.  (*Id.*)

Plaintiff returned to Dr. Allende for a general checkup in September 2014.  (Doc. 10-8 at 54)  Dr. Allende noted that Plaintiff reported less stress and opined her anxiety/depression was improved.  (*Id.*)  Dr. Allende indicated Plaintiff felt her "mental stress [was] better and can return to work."  (*Id.*)  However, the following month, Plaintiff complained of increased "stress related to work" and told Dr. Allende that she was "emotionally stressed out" and "can't return to work.  (*Id.* at 53)

In November 2014, Dr. Allende noted Plaintiff had "lots of stressors," including marriage, family, and work.  (Doc. 10-8 at 52)  Plaintiff reported improvement with her right shoulder.  (*Id.*)

In January 2015, Plaintiff returned to Dr. Allende, reporting she "ran out of meds so [she] stopped and then restarted."  (Doc. 10-8 at 51)  She stated that she continued to have low back pain, which she described as a 6 out of 10 but also said "meds help."  (*Id.*)  Dr. Allende found Plaintiff had a decreased range of motion in her back. (*Id.*)

In May 2015, Plaintiff complained of right shoulder pain and discomfort with spasms.  (Doc. 10-8 at 46)  She described her pain as a "6" out of 10.  (*Id.*)  Dr. Allende found that Plaintiff exhibited guarding and spasms in her back, and asymmetric extension with the musculoskeletal exam. (*Id.*)  The following month, Plaintiff told Dr. Allende that she had increased pain and having low back pain.  (*Id.* at 45)  Dr. Allende indicated Plaintiff again had "abnormal" results with her back and musculoskeletal exam.  (*Id.*)

In July 2015, Dr. Allende noted that Plaintiff complained of increased stress.  (Doc. 10-8 at 44)  He also indicated Plaintiff's shoulder surgery had resulted in "improved [range of motion]."  (*Id.*)

Dr. James Murphy performed a psychiatric evaluation on September 1, 2015.  (Doc. 10-8 at 68)  Dr. Murphy noted Plaintiff "interacted in a tearful, angry, unhappy but cooperative, manner during the interview session."  (*Id.*)  He also observed that Plaintiff's "personality was blunted and downtrodden."  (*Id.*)  Plaintiff said that she had "suffered with depression since 1998 when she involved in a work related stress situation with other work members."  (*Id.* at 69)  Plaintiff stated she had panic attacks "approximately four times a week," during which she "experience[d] shortness of breath, fear of being around people and a need to isolate."  (*Id.*)  Dr. Murphy noted that Plaintiff reported "these attacks began five years ago when she was working and she took medical leave in the guise of taking care of her mother.  In 2014 her sick leave ran out and she returned to work but was fired shortly there after

because she was unable to keep her emotions in check." (*Id.*) She also stated she was planning to file for a divorce the week after her evaluation. (*Id.* at 70) Dr. Murphy found Plaintiff's "attention was within normal limits," but her "[c]oncentration was less than adequate" because Plaintiff "could correctly spell the word 'world' forward but not backward." (*Id.* at 71) He found Plaintiff was "unable to interpret a simple proverb and her judgment appeared to be less than adequate." (*Id.*) Dr. Murphy opined Plaintiff's mental impairments included bereavement, "Major Depressive Disorder recurrent without psychotic features," alcohol dependence, and cannabis dependence. (*Id.* at 72) In addition, he believed Personality Disorder, NOS, should be ruled out. (*Id.* at 72) He determined these impairments caused Plaintiff restrictions with daily activities, and she would experience of emotional deterioration in work-like situations. (*Id.* at 71, 72) He also believed Plaintiff had "problems with concentration, persistence and pace that could jeopardize her ability to work." (*Id.* at 71) Further, Dr. Murphy opined Plaintiff had difficulty with social functioning, such that she would "not respond adequately to co-workers, supervisors and the public." (*Id.*, emphasis omitted) Dr. Murphy concluded Plaintiff was "not capable of performing Simple Repetitive Tasks (SRT) on a regular basis." (*Id.* at 72, emphasis omitted)

Dr. Tomas Rios performed an internal medicine evaluation on September 12, 2015. (Doc. 10-8 at 76-80) Plaintiff's chief complaints included a chronic back problem, injury to her right shoulder, and hypothyroidism. (*Id.* at 76) Dr. Rios noted that Plaintiff had physical therapy for her shoulder after the surgery "but she did not complete her therapeutic regimen." (*Id.*) Dr. Rios observed that Plaintiff was "in mild distress." (*Id.* at 77) He noted Plaintiff "was able to get on and off the examination table but she was reporting pain in the lumbar region." (*Id.*) Dr. Rios found:

> Examination of the back revealed tenderness along the lumbosacral region but no spasms observed and no findings of nerve root compromise. Reflexes in the patellar and Achilles were symmetric at 2+.
>
> Examination of the right shoulder revealed evidence of previous arthroscopic surgery and the claimant has range of motion limitation by pain. There is some mild wasting of the supraspinatus muscles.
>
> … Motor strength is 5/5 throughout the upper and lower extremities with the exception of the right shoulder extensors and flexors reduced at 4/5 secondary to pain. Muscle bulk and tone is normal.

(*Id.* at 79) Based upon these findings, including limits with range of motion and tenderness, Dr. Rios opined Plaintiff was limited to lifting and carrying "20 pounds occasionally and 10 pounds frequently."

(*Id.* at 80)  He found Plaintiff would "be unable to perform reaching overhead and can only perform occasional reaching forward;" but she had no limitations with handling, fingering, and feeling.  (*Id.*)  Finally, Dr. Rios concluded Plaintiff did not have any limits with sitting, standing, and walking; but could perform postural activities only on a frequent basis.  (*Id.*)

Dr. E. Murillo reviewed available records and completed a mental residual functional capacity assessment on October 13, 2015.  (Doc. 10-4 at 7-9, 13-14)  Dr. Murillo noted Plaintiff had mild to moderate mental limitations, "however she [was] not getting any consistent" mental health treatment, and her only treatment was by prescriptions from her primary care physician.  (*Id.* at 10, 13-14)  Dr. Murillo concluded Plaintiff was capable of simple, repetitive tasks with low public contact.  (*Id.* at 14)

Dr. K. Mohan reviewed the record related to Plaintiff's physical impairments and completed a residual functional capacity assessment on October 13, 2015.  (Doc. 10-4 at 10-12)  Dr. Mohan noted Plaintiff had a decreased range of motion in the right should and 4/5 motor strength in the upper right extremity, as well as back tenderness and pain with range of motion at the consultative examination.  (*Id.* at 12)  Dr. Mohan opined Plaintiff could frequently climb ramps and stairs, and occasionally climb ladders, ropes and scaffolds.  (*Id.* at 11)  Dr. Mohan found Plaintiff could frequently balance and kneel and occasionally stoop, crouch, and crawl due to her "chronic back pain."  (*Id.*)  In addition, Dr. Mohan opined Plaintiff was limited to occasional reaching overhead, "in front and/or laterally" with the right arm.  (*Id.* at 11, 12)

Dr. Allende completed a physical medical source statement on October 28, 2015.  (Doc. 10-9 at 2-3)  He noted that he had treated Plaintiff for ten years, "usually every 1-2 months," and she was diagnosed with hypertension, hypothyroidism, chronic pain disorder of the lumbar spine, anxiety, and osteoporosis.  (*Id.*)  Dr. Allende also believed Plaintiff had psychological conditions including dependent personality disorder, depression, and anxiety.  (*Id.*)  According to Dr. Allende, Plaintiff exhibited depressed affect, decreased energy, and slow motivation.  (*Id.*)  He opined Plaintiff could sit for 30 minutes at one time, or at least six hours in an eight-hour day; walk one block at a time; stand 20 to 30 minutes at one time; stand and walk four hours total in an eight-hour day; and would require a job that permitted shifting positions at will from sitting, standing, and walking.  (*Id.*)  Dr. Allende believed Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; twist occasionally; and

stoop, crouch, and climb rarely. (*Id.* at 4) He indicated Plaintiff did not have significant limits with reaching, handling, or fingering. (*Id.*) Dr. Allende believed Plaintiff was likely to be off task 25% or more of a workday and miss 4 or more days per month. (*Id.*)

On January 5, 2016, Dr. Collado reviewed Plaintiff's medical records related to her mental impairments and completed a residual functional capacity assessment for Plaintiff's current level of functioning. (Doc. 10-4 at 29-31) Dr. Collado opined Plaintiff was "[n]ot significantly limited" with the ability to understand and remember very short and simple instructions and had moderate limitations with detailed instructions. (*Id.* at 29) In addition, Dr. Collado opined Plaintiff was "[a]ble to relate appropriately with supervisors [and] co-workers," and "would benefit from limited public contact." (*Id.* at 30) Dr. Collado also believed Plaintiff was "[a]ble to respond and adapt to changes in a work setting." (*Id.* at 31)

Dr. Ian Ocrant also reviewed the record after Plaintiff's request for reconsideration and completed a physical residual functional capacity assessment on January 13, 2016. (Doc. 10-4 at 27-29) Dr. Ocrant opined Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, sit about six hours in an eight-hour day, and stand and/or walk about six hours in an eight-hour day. (*Id.* at 27) He determined Plaintiff could push and pull on a limited basis with her right arm; and perform overhead activities on an occasional basis. (*Id.*) In addition, Dr. Ocrant believed Plaintiff could occasionally climb, stoop, kneel, crouch, and crawl; and indicated these limitations were due to her "chronic back pain, [right] shoulder derangement." (*Id.* at 27-28) Dr. Ocrant concluded Plaintiff should avoid concentrated exposure to extreme cold and hazards such as unprotected heights. (*Id.* at 28-29)

On January 15, 2016, Plaintiff visited Dr. Allende for prescription refills and reported her "back pain [was] controlled [with] meds." (Doc. 10-9 at 7) Dr. Allende indicated that Plaintiff's generalized anxiety and depression were "better," and her hypothyroidism was "improved." (*Id.*) Dr. Allende refilled each of Plaintiff's prescriptions. (*Id.*)

In February 2016, Plaintiff told Dr. Allende that her pain was a six out of ten. (Doc. 10-9 at 6) Upon examination, Dr. Allende found Plaintiff's neck had "mild enlargement," and she exhibited guarding with a reduced range of motion in her back. (*Id.*) Dr. Allende indicated Plaintiff should continue taking the same medication. (*Id.*) The following month, Plaintiff stated she was having

difficulty with her insurance and prescription coverage. (*Id.*) Dr. Allende did not note any findings related to a musculoskeletal exam or subjective complaints from Plaintiff related to her pain. (*Id.* at 5)

In September 2016, Plaintiff visited Heu Medical Group to establish care. (Doc. 10-9 at 24) Dr. Pa Heu noted Plaintiff appeared in distress, and Plaintiff said she did not take her antidepressant medication. (*Id.*) Plaintiff also reported she had pain in her low back and right shoulder, insomnia, and hypertension. (*Id.*) Dr. Heu indicated Plaintiff should "resume Prozac" and issued a prescription for it and Bupropion. (*Id.*)

In March 2017, Plaintiff returned to Heu Medical Group, requesting a note for her dogs "so she can keep them." (Doc. 10-9 at 18) Dr. Heu informed Plaintiff they were not able to write such a note. (*Id.*) Plaintiff also described paresthesia and pain in her hands. (*Id.*) Upon examination, Dr. Heu opined Plaintiff's musculoskeletal system and skin appeared within normal limits. (*Id.*)

**B.    Administrative Hearing**

Plaintiff testified that she continued to have problems with her right shoulder. (Doc. 10-3 at 66) She said her shoulder made it difficult to swim and she could no longer do a backstroke, so she would "just kind of like just float… and doggy paddle." (*Id.*) Plaintiff explained she could only hold her arm out in front of her for seconds before it started feeling heavy. (*Id.* at 67) She stated that she could not hold her arm over her head, and it hurt to "put shifts on and off." (*Id.* at 67-68) Plaintiff also said she did not drive a lot, but when she did, she would "sit as close as [she] can." (*Id.* at 68)

She stated she also had depression and sometimes did not want to get out of bed. (Doc. 10-3 at 69) Plaintiff said she had more bad days than good. (*Id.* at 69-70) In addition, Plaintiff stated she "was off [the] medicine last year for a little bit" because her husband left and he would not give her money to get medication. (*Id.* at 70) Plaintiff testified that she "was very… suicidal at that time." (*Id.*) Plaintiff reported she was taking Wellbutrin and Prozac, which helped, but she thought Wellbutrin should change because she felt it did not "work[] all the time like it should." (*Id.*)

**C.    The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of October 1, 2013. (Doc. 10-3 at 19) Second, the ALJ found Plaintiff's severe impairments included: "Osteopenia, Rotator Cuff Syndrome,

Depression, Anxiety, and Hypothyroidism." (*Id.*) At step three, the ALJ determined Plaintiff's impairments did not meet or medically equal a Listing. (*Id.* at 20-21) Next, the ALJ found:

> [T]he claimant has the residual functional capacity to perform work light work as defined in 20 CFR 404.1567(b). The claimant is able to lift and carry ten pounds frequently and twenty pounds occasionally. She is able to sit for at least six hours of an eight-hour workday. She is able to stand and/or walk for at least six hours of an eight-hour workday. She is able to occasionally climb ladders, ropes, scaffolds, ramps, and stairs. She is able to occasionally crawl, crouch, kneel, and stoop. She is able to occasionally reach overhead with the right upper extremity. The claimant should not work in environments exposing her to extreme cold temperatures, unprotected heights or machinery with moving mechanical parts. The claimant is able to perform jobs of a non-complex nature requiring the performance of nothing beyond simple repetitive tasks and is able to maintain occasional contact with member of the general public.

(*Id.* at 22) With this residual functional capacity, the ALJ found at step four that Plaintiff was unable to perform any past relevant work. (*Id.* at 31) However, at step five the ALJ found "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.*) Thus, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act from October 1, 2013, through the date of the decision. (*Id.* at 32-33)

## DISCUSSION AND ANALYSIS

Appealing the decision to deny her applications for benefits, Plaintiff argues that "[t]he ALJ erred rejecting the opinions of treating physician Dr. Allende, examining physician Dr. Rios, examining physician Dr. Murphy, and non-examining physician Dr. Mohan, based upon a selective recitation of isolated benign findings, to the ignorance of the record as a whole." (Doc. 13 at 11) On the other hand, the Commissioner argues the ALJ's evaluation of the opinion evidence is supported by substantial evidence. (Doc. 14 at 3-7)

## A.     Evaluation of the Medical Evidence

When evaluating the evidence from medical professionals, three categories of physicians are distinguished: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician has been afforded the greatest weight, but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld by the Court when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). An ALJ may reject the opinion of a medical source that is contradicted by another opinion with "specific and legitimate" reasons, supported by substantial evidence in the record. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

The ALJ gave "significant weight" to the opinions of non-examining physicians Drs. Murillo, Ocrant, and Collado; and gave "some weight" to the opinions of Drs. Murphy, Rios, and Allende. (Doc. 10-3 at 26- 28) Plaintiff contends the ALJ failed to identify legally sufficient reasons to reject portions of the opinions from the examining physicians and her treating physician, and instead giving more weight to the opinions of non-examining physicians. (Doc. 13 at 9-15)

### 1. Dr. Allende's opinion

In reviewing the medical record, the ALJ summarized the conclusions of Dr. Allende and indicated "some weight" was given to the limitations identified. (Doc. 10-3 at 27) The ALJ explained:

> The undersigned assigns some weight to the opinions of Dr. Allende, because the opinions are not consistent with the record as a whole. Specifically, the undersigned finds that the record is supportive of limitation to light exertional level, though time off task and absences are not supported by the treatment record (Ex. 1F/16, 17, 26, 28; 2F/4; 3F/12; 4F; 5F; 9F/8). In addition, Dr. Allende's opinions do not address the claimant's upper extremity functioning (Ex. 6F). Moreover, Dr. Allende's opinions regarding standing/walking limitations are exaggerated in respect the claimant's testimony of activities and record of treatment (Ex. 3E; 5F). To illustrate, the claimant has demonstrated a normal gait and was able to get on and off an examination table (Ex. 5F).

(*Id.*) Plaintiff contends the reasons identified by the ALJ are not sufficient and lack support in the record. (Doc. 13 at 10-11)

Plaintiff argues: "While the ALJ cited to a lengthy string of records which purportedly support the RFC for light work, there is nothing in the cited pages which support this conclusion or contradict Dr. Allende's opinion." (Doc. 13 at 10) According to Plaintiff, "not only do these records lack evidence that Plaintiff is capable of light-level exertion, but they in fact suggest the contrary, as they

include pre-surgical imaging and physical therapy records detailing severely limited daily activities." (*Id.*) Further, Plaintiff asserts that rejection of the opinion on the grounds that it did not address her upper extremity functioning "is does not constitute a legitimate reason for rejecting the limitations which his opinion *did* address." (*Id.* at 11) Plaintiff contends the ALJ engaged in a "selective reference [to] the consultative examiner's report" related to her ability to walk and get on and off the examination table, and he "failed to explain how a normal gait in an examination room constitutes evidence of ability to stand and walk for six hours per day without breaks." (*Id.*)

In response, Defendant contends, "The ALJ's rejection of… the treating opinion of Dr. Allende is… supported." (Doc. 14 at 4) Defendant observes, "Dr. Ocrant specifically stated the opinion of Plaintiff's treating doctor, Dr. Allende, was 'not objectively supported.'" (*Id.* at 3, citing AR 27-28, 107 [Doc. 10-3 at 28-29; Doc. 10-4 at 24]). Defendant also asserts:

> For Dr. Allende, he issued an opinion that Plaintiff could only walk only one block, would need two to four unscheduled breaks a day, and would be off task more than 25% of the days, along with significant limitations to sitting and standing (AR 26, 356-358). The ALJ found this opinion unsupported by the record (AR 26). Indeed, these limitations are unsupported by a record showing nonaggressive medications, only mild imaging findings, and where Plaintiff did not take prescribed medications (AR 26 referencing AR 290, 291, 301, 300, 302 (imaging findings), 309 (showing only mild findings from shoulder xray), 340-355, 378 ("Patient did not take anti-depressants")). Similarly, the ALJ found walking and standing limitations not supported by Plaintiff's normal gait and cited to the examination of Dr. Rios, who opined to no standing, walking, or sitting limitation whatsoever (AR 26 referencing AR 353)[.]

(Doc. 14 at 5)

### a. *Conflict with the record*

Significantly, the Ninth Circuit determined an ALJ may reject limitations "unsupported by the record as a whole." *Mendoza v. Astrue*, 371 Fed. Appx. 829, 831-32 (9th Cir. 2010) (citing *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003)). However, when an ALJ believes the treating physician's opinion is unsupported by the objective medical evidence, the ALJ has a burden to "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct."). For example, an ALJ may also discount the opinion of a treating physician by

identifying an examining physician's findings to the contrary and identifying the evidence that supports that finding. *See, e.g., Creech v. Colvin*, 612 F. App'x 480, 481 (9th Cir. 2015).

As Plaintiff argues, the ALJ failed to identify the findings in the record that conflicted with Dr. Allende's conclusions that Plaintiff could sit for 30 minutes at one time, or at least six hours in an eight-hour day; walk one block at a time; stand 20 to 30 minutes at one time; stand and walk four hours total in an eight-hour day; and required a job that permitted shifting positions at will from sitting, standing, and walking. Further, there is no explanation why the ALJ believed the opinion that Plaintiff was likely to miss work is contradicted by the record. Although the ALJ cited the records found at "1F/16, 17, 26, 28; 2F/4; 3F/12; 4F; 5F; 9F/8," he failed to identify any specific objective findings in these records that address the limitations identified by Dr. Allende. For this reason, the ALJ erred in addressing the record.

Notably, Exhibit 1F page 16 and 17 relate to the examination immediately before Plaintiff's surgery and the day after Dr. Simonian performed the procedure. (*See* Doc. 10-8 at 17-18) The findings therein include "markedly" positive findings, tenderness, and reduced rotator cuff strength. (*Id.*) Other pages cited include imagining prior to surgery, mammogram results, a physical therapy note indicating "deficits in range of motion and strength following right shoulder arthroscopic" surgery and debridement, and treatment notes without objective findings related to Plaintiff's ability to sit, stand, or walk. (*See* Exh. 1F, p. 26, 28; Exh. 2F, p. 4; Exh. 3F at 12; [Doc. 10-8 at 27, 29, 36, 55; Doc. 10-9 at 24]) Thus, these exhibits cited by the ALJ fail to support the decision to reject limitations identified by Dr. Allende as to Plaintiff's limitations for sitting, standing, walking, need for a job that permits shifting positions at will, or need for unscheduled breaks during the day. Likewise, the physical findings do not address Dr. Allende's opinion that Plaintiff would be off task for more than 25% of a workday.

Further, the ALJ fails to explain how the limitations identified by Dr. Allende conflict with the opinions of Dr. Murphy (Exhibit 4F) and Dr. Rios (Exhibit 5F). Broadly citing to the entirety of their reports does not satisfy the ALJ's burden to identify the conflicting clinical evidence between the physicians' opinions and resolve this conflict. *See Cotton*, 799 F.2d at 1408; *Reddick*, 157 F.3d at 725; *see also Ortiz v. Colvin,* 2016 WL4992674, at *7 (E.D. Cal. Sept. 19, 2016) ("It is not sufficient for the

ALJ simply to state that evidence and opinions exist that are contrary to the treating doctor's opinion, leaving it to the court to dig around through the record in search of the unidentified evidence and opinions"). Consequently, the purported inconsistencies with "the record as a whole" and "the treatment record" do not support the ALJ's decision to reject limitations identified by Dr. Allende.[1]

### b.    Plaintiff's level of activity

The Ninth Circuit determined an ALJ may reject an opinion when the physician sets forth restrictions that "appear to be inconsistent with the level of activity that [the claimant] engaged in." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *see also Fisher v. Astrue*, 429 Fed. App'x 649, 652 (9th Cir. 2011) (concluding the ALJ set forth specific and legitimate reasons for rejecting a physician's opinion where the assessment was based upon the claimant's subjective complaints, and limitations identified by the doctor conflicted with the claimant's daily activities).

The ALJ opined: "Dr. Allende's opinions regarding standing/walking limitations are exaggerated in respect the claimant's testimony of activities and record of treatment (Ex. 3E; 5F). To illustrate, the claimant has demonstrated a normal gait and was able to get on and off an examination table." (Doc. 10-3 at 27) However, the ALJ fails to explain how Plaintiff's normal gait and ability to get on and off the examination table at the consultative examination conflict with Dr. Allende's opinion that Plaintiff was limited to walking one block at a time or standing 20 to 30 minutes at one time. Thus, the limited activities identified do not support the decision to reject the standing and walking limitations identified by Dr. Allende.

### c.    Conclusion

The ALJ failed to identify specific, legitimate reasons supported by the record to reject limitations identified by Dr. Allende related to Plaintiff's ability to sit, stand, walk, and complete a

---

[1] Importantly, the Court is "constrained to *review* the reasons the *ALJ* asserts." *Brown-Hunter*, 806 F.3d at 494 (emphasis in original) (quoting *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)); *Bray v. Comm'r*, 554 F.3d 1219, 1229 (9th Cir. 2009) (the Court cannot engage in "*post hoc* rationalizations that attempt to intuit what the [ALJ] might have been thinking"). Although the Commissioner identifies evidence in the record to support the ALJ's conclusion that the treatment record does not support the limitations identified by Dr. Allende (*see* Doc. 14 at 5) this evidence not identified *by the ALJ* as conflicting with the opinion of Dr. Allende. Consequently, the Court is unable to find the conflicts now identified by the Commissioner support the ALJ's decision.

Similarly, although the Commissioner notes Dr. Ocrant believed the "MSO provided by rep [was] not objectively supported" (Doc. 10-4 at 24) this conclusion was not cited by the ALJ to reject Dr. Allende's opinion. Regardless, it was the ALJ's burden to support such a conclusion by identifying conflicting evidence in the record. *See Cotton*, 799 F.2d at 1408; *Reddick*, 157 F.3d at 725. However, the ALJ failed to carry this burden.

normal workday/workweek. Accordingly, the ALJ erred in evaluating the opinion of Plaintiff's treating physician and giving the opinion less than controlling weight.

### 2. Dr. Rios' opinion

In reviewing the record, the ALJ summarized the conclusions of Dr. Rios and explained "some weight" was given to the opinion of the examining physician. (Doc. 10-3 at 26) The ALJ indicated:

> [T]he undersigned finds that the on-going record of treatment does not support the opined limitations regarding the claimant's right upper extremity, nor do the opinions and observations of the claimant's treating physicians (Ex. 1F/23; 9F/8; Hearing Testimony). Specifically, in June 2014, after the claimant's surgery, she reported difficulty in performing her activities of daily living; however, at the September 2015, consultative examination, the claimant reported that she was independent with her activities of daily living (Ex. 1F/26; 5F). In addition, despite having a limited range of motion, her motor strength was 5/5 in both her upper extremities with sensory intact (Id.). Finally, at the hearing, the claimant stated she could drive and go swimming (Hearing Testimony).

(*Id.* at 26) Thus, the ALJ rejected Dr. Rios' opinion that Plaintiff would "be unable to perform reaching overhead and can only perform occasional reaching forward." (*Id.*; *see also* Doc. 10-8 at 80) Plaintiff contends this analysis by the ALJ "simply incorrect. (Doc. 13 at 11)

Plaintiff notes the ALJ again citied Exhibit 1F/ 23, and Exhibit 9F/ 8, which were part of the report detailing Plaintiff's surgery and a treatment note when Plaintiff presented in emotional distress. (Doc. 13 at 11) Plaintiff contends these records do not address her physical functionality. (*Id.*) Further, Plaintiff argues that her "hearing testimony detailed markedly limited ability to use her right arm for overhead, forward, and lateral reaching." (*Id.* at 12) Plaintiff asserts the ALJ ignored the context of her statements and erred in finding her activities inconsistent with the limitations identified. (*Id.*)

On the other hand, the Commissioner contends the decision to give less weight to the opinion of Dr. Rios —and more weight to the opinion of non-examining physician Dr. Ocrant—should be affirmed. (Doc. 14 at 4) The Commissioner maintains the rejection of the opinion of Dr. Rios was supported "because the limits to occasional reaching and no overhead reaching conflicted with Plaintiff's admissions at the hearing that she could drive without issue (AR 25 referencing AR 62)." (Doc. 14 at 4-5) Further, the Commissioner notes, "medical evidence showed Plaintiff had full motor strength in her right arm (AR 25)." (*Id.*)

///

### a. Conflict with the record

As noted above, an ALJ may reject limitations identified by a physician due to conflicts with the objective record, but must set out a "summary of the facts and conflicting clinical evidence," as well as his interpretation of the evidence and findings. *See Mendoza*, 371 Fed. Appx. at 831-32; *Cotton*, 799 F.2d at 1408.

In finding the reaching limitations identified by Dr. Rios were not supported by "the on-going record of treatment" and "the opinions and observations of the claimant's treating physicians," the ALJ again cited Exhibits 1F/23, 1F/26, and 9F/8. (Doc. 10-3 at 26) However, the ALJ failed to identify any specific findings in these records that address Plaintiff's ability to reach following her surgery. Moreover, the cited documents include the surgical report from Dr. Simonian (Exh. 1F/23, Doc. 10-8 at 24) and a treatment note from Heu Medical Group that primarily addressed Plaintiff's distressed mental state, without findings or opinions related to her reported shoulder pain (Exh. 9F/8, Doc. 10-9 at 27). Thus, these exhibits do not support the ALJ's assertion that the findings of Dr. Rios conflict with the treatment record.

Further, though the ALJ cited Exhibit 1F/26 and Exhibit 5F in support of the assertion that Plaintiff's "motor strength was 5/5 in both her upper extremities with sensory intact" (Doc. 10-3 at 26), the cited records contradict the conclusion. Daniel Alfaro, Plaintiff's physical therapist, noted that Plaintiff presented with "deficits in range of motion *and strength*." (Exh. 1F/26, Doc. 10-8 at 27) (emphasis added). In addition, Dr. Rios opined Plaintiff's "[m]otor strength [was] 5/5 throughout the upper and lower extremities *with the exception of the right shoulder extensors and flexors reduced at 4/5...*" (Doc. 10-8 at 79) (emphasis added) The ALJ's selective reading of the record and medical findings in Exhibits 1F/26 and 5F do not support the decision to reject the findings of Dr. Rios related to Plaintiff's ability to reach overhead and forward.

### b. Plaintiff's activities and testimony

In rejecting the limitations identified by Dr. Rios, the ALJ also referred to Plaintiff's reported activities of daily living and testimony that "she could drive and go swimming." (Doc. 10-3 at 26) Notably, although Dr. Rios noted Plaintiff was "able to drive a vehicle and is independent with activities of daily living" (Doc. 10-8 at 77), he did not offer any information as to Plaintiff's specific

activities or whether Plaintiff had difficulty completing such tasks.  However, as Plaintiff notes, her

testimony provided insight into her activities, including her ability to swim and drive:

> She reported she is unable to lift or throw due to her shoulder problem, and has trouble
> holding her arm in front of her. Ar. 66. She cannot hold her arm over her head, and has
> difficulty dressing herself. Ar. 66-67. Some days she simply does not change her
> clothes because she is unable to dress herself. Ar. 71. She cannot lift, or grasp, or do
> simple things such as put her hair in a ponytail without difficulty. Ar. 72-73.

(Doc. 13 at 12)  Further, Plaintiff testified at the hearing that her shoulder made it difficult to swim and

she could no longer do a backstroke, so she would "just kind of like just float… and doggy paddle."

(Doc. 10-3 at 66)  She also stated that she did not drive a lot, but when she did, she would "sit as close

as [she] can" to the wheel.  (*Id.* at 68)  Because the ALJ does not clearly explain how this testimony

regarding Plaintiff's limited activities conflict with the reaching limitations identified by Dr. Rios, her

activities of daily living are not a specific, legitimate reason for rejecting Dr. Rios' conclusions that

Plaintiff was precluded from overhead reaching and could only occasionally reach forward.

### c.   Conclusion

The ALJ engaged in a selective reading of the record and failed to identify specific, legitimate

reasons to reject the reaching limitations identified by Dr. Rios.  Thus, the ALJ erred in evaluating the

opinion of Dr. Rios and rejecting the conclusions that Plaintiff "be unable to perform reaching overhead

and can only perform occasional reaching forward."

### 3.   Opinion of Dr. Mohan

Plaintiff contends the ALJ also erred in evaluating the medical opinion from Dr. Mohan, a non-

examining physician.  (Doc. 13 at 13)  The ALJ noted that Dr. Mohan opined Plaintiff had limitations

with pushing; pulling; and "a limited ability in using her right arm" for reaching in front, laterally, and

overhead.  (Doc. 10-3 at 27-28)  The ALJ addressed the weight given to the opinions as follows:

> The undersigned assigns little weight to the opinions of Dr. Mohan, because they are
> not consistent with the medical record (Ex. 1F/16, 17, 26, 28; 2F/4; 3F/12; 5F).
> Specifically, the record of treatment and the opinions of the treating physician do not
> support the opined restrictions to the  right upper extremity (Ex. 1F/16, 17, 26, 28;
> 2F/4; 3F/12; 5F).  In addition, as a DDS examiner, Dr. Mohan did not have the
> benefit of conducting a physical examination on the claimant before submitting the
> above opinions.

(*Id.* at 28)

As set forth above, merely stating a conclusion that the opinion of a physician is inconsistent

with the record or conflicts with the opinions of other physicians is not sufficient. *See Cotton*, 799 F.2d at 1408; *Reddick*, 157 F.3d at 725; *see also McClung v. Astrue*, 2013 U.S. Dist. LEXIS 1627 at *13 (E.D. Cal. Jan. 4, 2013) (finding the ALJ where specific conflicting findings were not identified because "[t]he ALJ must do more than offer his conclusion that an opinion is inconsistent with the record as a whole"). Further, the exhibits repeatedly cited by the ALJ—and addressed above related to the opinions of Drs. Allende and Rios—do not support the ALJ's conclusions. Thus, the ALJ also erred in evaluating the opinion of Dr. Mohan.

### 4. Opinion of Dr. Murphy

Plaintiff contends the ALJ erred in evaluating the opinion from Dr. Murphy, who performed a psychiatric consultative examination. (Doc. 13 at 14) The ALJ addressed the opinion as follows:

> James R. Murphy, Ph.D., opined that the claimant had a restriction concerning daily activities due to bereavement and depression (Ex. 4F). Dr. Murphy further opined that the claimant does have difficulty maintaining social functioning (Id.). Moreover, Dr. Murphy opined that the claimant had difficult[y] with concentrating, persisting, and maintaining an appropriate pace, which could jeopardize her ability to work (Id.). In addition, Dr. Murphy opined, the claimant will experience episodes of emotional deterioration in work like situations, and she is not capable to understand, carry out, and remember simple instructions (Id.). Furthermore, Dr. Murphy opined that the claimant would not respond adequately to co-workers, supervisors or the public and she would have difficulty responding appropriately to normal work situations (Id.). Dr. Murphy also opined that the claimant will have difficulty dealing appropriately with changes in routine work settings and she has additional limitations due to her mental impairments (Id.). Finally, Dr. Murphy opined that the claimant was not capable of performing simple repetitive tasks on a regular basis (Id.).
>
> The undersigned assigns some weight to Dr. Murphy's opinions, as they are not consistent with the record as a whole (Ex. 4F; 7F; 9F). Specifically, the opinions of Dr. Murphy identify psychological issues suffered by the claimant; however, the severity level is not support by the record of treatment after her evaluation. Specifically, the claimant is able to form new relationships and adjust to changes in her household (Ex. 9F/2; Hearing Testimony). In addition, at the psychological evaluation, the claimant's attention was within normal limits and she was cooperative with the examiner (Ex. 4F). Moreover, the claimant was able to make good eye contact with the examiner and her speech was adequate (Id.). Also, the claimant's intelligence and knowledge were assessed as adequate (Id.). Further, the claimant was able to perform basic calculations without difficulty (Id.). Finally, the restrictions opined by Dr. Murphy regarding the claimant's functional limitations are contemporaneous with the passing of the claimant's mother, which was understandably a significant stressor.

(Doc. 10-3 at 25-26)

Plaintiff argues the ALJ's analysis was improper "because the ALJ selectively ignored the multitude of positive clinical findings which support Dr. Murphy's opinion." (Doc. 13 at 14) In

addition, Plaintiff argues the ALJ erred in rejecting the evaluation as " 'contemporaneous' with the passing of [her] mother Plaintiff's mother, suggesting that the opined limitations were transient," because the evaluation took place two years after her mother passed away. (*Id.*)

In response, Defendant contends the ALJ did not err in giving little weight to the opinion of Dr. Murphy and more weight to the opinions of Drs. Murillo and Collado, non-examining physicians. (Doc. 14 at 6) Defendant observes that "[t]he ALJ noted that Dr. Murphy's exam was not supported by Plaintiff's level of treatment," and "this was a consideration noted by Drs. Murillo and Collado when discounting the opinion of Dr. Murphy." (*Id.*, citing AR 98, 115 [Doc. 10-4 at 15, 32]) Further, Defendant contends: "Drs. Murillo noted limited positive mental health findings and that Plaintiff did not receive mental health treatment outside medication from her primary care doctor." (*Id.*, citing AR 88-91 [Doc. 10-4 at 6-8]) Defendant concludes, "Thus, the ALJ had good reason to give more weight to the opinions of Drs. Murillo and Collado, doctors who reviewed the majority of the record and also opined Plaintiff could perform simple, repetitive work with limits to public contact." (*Id.*)

### a. Timing of the opinion

As an initial matter, it appears Defendant concedes the ALJ erred in considering the timing of Dr. Murphy's opinion as a reason to reject the opinion, as the Commissioner does not respond to Plaintiff's argument that this reason was improper. (*See generally* Doc. 14 at 6) Indeed, as Plaintiff argues, the record indicates her consultative examination with Dr. Murphy occurred approximately two years after the death of her mother. In October 2013, Dr. Allende noted Plaintiff appeared "emotionally labile" following the recent death of her mother, and prescribed Valium and Prozac. (Doc. 10-8 at 64) However, the consultative examination did not occur until September 2015. (*Id.* at 68) Given the significant difference in time, it is unclear why the ALJ believed the opinion should be rejected as "contemporaneous with the passing of the claimant's mother." (*See* Doc. 10-3 at 26) Thus, this reason does not support the ALJ's rejection of the limitations identified.

### b. Failure to address probative evidence

The Commissioner also fails to address Plaintiff's argument that the ALJ ignored positive findings in reviewing the report from Dr. Murphy. (*See* Doc. 14 at 6)

The Ninth Circuit determined that "in interpreting the evidence and developing the record, the

19

ALJ does not need to discuss every piece of evidence." *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (internal quotations omitted). Rather, the ALJ must explain only "why significant probative evidence has been rejected." *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984); *see also Flores v. Shalala,* 49 F.3d 562, 570-71 (9th Cir. 1995) (the ALJ "may not reject significant probative evidence without explanation").

Plaintiff notes that Dr. Murphy observed that she "acted in a tearful, angry, and unhappy manner, but was cooperative throughout the session;" noted Plaintiff's "personality was blunted and downtrodden;" "[h]er attitude was intense, emotional, and tearful;" and "her concentration was less than adequate." (Doc. 13 at 15, citing AR 341-42 [Doc. 10-8 at 69-70]) In making these findings, Dr. Murphy stated Plaintiff's "[c]oncentration was less than adequate" because she "could correctly spell the word 'world' forward but not backward." (Doc. 10-8 at 71) Dr. Murphy also found Plaintiff was "unable to interpret a simple proverb and her judgment appeared to be less than adequate." (*Id.*) Further, as Plaintiff notes, the ALJ did not address Dr. Murphy's observations regarding her mood, personality, or attitude. (*See* Doc. 10-3 at 26)

Probative evidence of an individual's mental functioning may not be ignored. *See,* 20 C.F.R. § 404.1527(a)(2); *see also, e.g., St. Clair v. Colvin*, 2014 WL 5421261 at *6, 208 Soc. Sec. Rep. Service 593 (W. Wash. Oct. 23, 2014) (finding the ALJ erred by failing to address "independent observations," "such as that plaintiff appeared unkempt, expressionless, and hostile" because they were "significant, probative observations that the ALJ should have discussed"). Thus, the ALJ erred in reviewing the findings from Dr. Murphy's consultative examination.

### c. Conclusion

Although the ALJ identified evidence conflicting with the findings of Dr. Murphy—such as Plaintiff's cooperative behavior, good eye contact, and normal attention—the ALJ ignored other significant and probative evidence in the consultative examination report. Thus, the ALJ erred in evaluating the record related to Plaintiff's mental residual functional capacity and the limitations identified by Dr. Murphy.

## B. Remand is Appropriate

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to

order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

The ALJ failed to resolve conflicts in the medical record and to address significant, probative evidence, because the numerous opinions of the physicians are not "inconsequential to the ultimate nondisability determination." *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). Accordingly, the matter should be remanded for the ALJ to re-evaluate the medical evidence and determine Plaintiff's residual functional capacity. *See Moisa*, 367 F.3d at 886.

## CONCLUSION AND ORDER

For the reasons set for above, the Court finds the ALJ erred in evaluating the medical evidence, and the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and

2. The Clerk of Court is **DIRECTED** to enter judgment in favor of Eleanor Gail Swain Western, and against Defendant, the Commissioner of Social Security.

IT IS SO ORDERED.

Dated: __ **March 10, 2020** __          _____ **/s/ Jennifer L. Thurston** _____
                                        UNITED STATES MAGISTRATE JUDGE